Good morning. May it please the Court, John Purcell for Mr. Escamilla. This case involves a motion to suppress. The main evidence that was obtained during the contested search was Mr. Escamilla's phone number connected to Mr. Escamilla's cell phone. That number that was found on his cell phone during the contested search then was used at trial to connect Mr. Escamilla to the conspiracy. But just so we're clear, there are three times they get the phone. Arguably, the first consent one, he hands it to them. Right. And there's no evidence the district court made a finding that they got the number then. So are you zeroing in on the second one when they do it after the arrest, and then there's the third time once he disclaims ownership? Right. So in the brief, I briefed that the initial consent to give the phone was not to the first agent. Here, what I thought I would address was that the second search by the agent after the arrest at the station house was beyond the scope of the consent given at the scene. My question is there's nothing in the record to suggest they got his telephone number from the first one. Correct. Okay. Correct. But why wouldn't they have gotten it by what I think of as the third one when he's disclaimed ownership? They would have gotten it from their cell – I don't know how you say the word – cellubrite swipe? Cellbrite? Yeah, cellbrite. He says, oh, this is my girlfriend's. Then they do the cellbrite swipe. They would have necessarily gotten it then, whether you call this harmless or the government characterizes it as inevitable discovery. Why wouldn't, regardless of what happens in the second one, they get it and be able to match it up with the records from the phone that he – see what I'm saying? Right, I do. And I guess I was going to dovetail. Okay. You go at whatever your pace. If you're going to get to that point, great. But the – it dovetails with this. On the second search, my argument is that it was beyond the scope, but also that he did not abandon the – any privacy interest in the phone. And I can just address that now. And I think what Judge Higginson's getting at is, let's say we agree with you that Antonelli's search at the station lacked consent and was therefore unlawful. But it was then later abandoned and the cellbrite test continued. I know you disagree with that, but if that's the way we analyze this, why doesn't the final cellbrite search give them the information they needed at trial? And is the Court's question that the cellbrite is inevitable discovery, or is it that they – It might just be independent source. I know the government argued it's inevitable discovery. But however categorized, why – if we think the third search was not unconstitutional, why doesn't that moot these other – Okay. The – well, the cellbrite search was conducted without warrant, and the government's position is that Mr. Escamilla had abandoned the privacy interest in the phone, but when he disclaimed ownership of it at the station. However, the – this Court in Finley has said that ownership of a cell phone is not necessary to have a privacy interest in the cell phone. And in Finley, the defendant was – the cell phone was provided by his employer. So he didn't own it, but he used it. Do you have to win the abandonment issue to invalidate that third search? Or can you win even if the third search was proper but the second one was improper? On that third – I have to win on the abandonment issue. Do you think if the third search was proper, that gave the government what it needed at trial, the identity of the number? Well, there are also, though, several arguments that even getting him to the station – that assumes that I lose on all of the arguments leading to him being at the station. But I would agree with that, that – So you're – it's critical that we look closely at Finley then? At Finley. And the government has cited Powell from this Court where – to support the abandonment argument. Their argument is that in Powell, the defendant said, this isn't my phone, it's the co-defendant's phone. And this Court said that that was an abandonment of the privacy interest. But that's consistent with Finley because in Powell, there was no evidence that the defendant who denied ownership of the phone had used the phone. She just said, not my phone, co-defendant's phone. In this case, Mr. Escamilla said, I was calling my girlfriend on this phone, but I don't – it's not mine. I thought they said, pick up the stuff that's yours, and he doesn't pick up the phone. No? I don't remember how – it turned out that he did say it wasn't his. But he did say – He'd used it. He had used it to call his girlfriend, or he had told the first agent, I was calling my girlfriend. So law enforcement knew that he had called his girlfriend using it. This piece of evidence, I'm taking – I guess it was harped on in closing. In other words, it connects your client to the only drugs. It was a big piece because it's – they put into evidence – There were, like, the same fresheners, air fresheners, and there was one glove in one car matching the other glove. Could you get – would there be a harmlessness issue, or you think the government zeroed in on this as the conclusive connection? Well, this seemed like the – to show that Mr. Escamilla was not merely present, but that he had knowledge and had joined the conspiracy. I think it was necessary – it was – Because so many calls. Right. Because there were all the – All the calls before the event. Yeah. Exactly. And so the government did focus on it. They put into evidence the results from their administrative subpoena that showed all the phone calls connecting the phones, and then they also had a summary chart that showed, you know, the connections. And then during closing argument, the prosecutor asked the jury, well, how do we know that he was connected to this conspiracy? Well, here's how. And he focused in on those cell phone records and that they showed the planning and knowledge. So without that, the government could have said, well, yeah, these guys might have known each other, but if my client is present, that doesn't mean he knows what the other guy is doing, and even if he does know, it doesn't mean he's – The overall flavor they're saying is your client says take it, look at it originally. Pretty straightforward consent. Then at the end he says it's not mine, it's my girlfriend's. And in that overarching picture, the continuum of their using the phone isn't unreasonable. It's not an unreasonable Fourth Amendment inquiry. He gave it to them at the beginning. At the end he sort of does the same. But you're probably going to tell me we've got to segment each one and look at each one. My reading of the record was that Antonelli actually looked at the phone before he spoke to Mr. Escamilla. Back at the road stop? No. You're right, Antonelli. Antonelli at the station actually looked at the phone before – the agents who had pulled Mr. Escamilla over said, hey, he's consented to search the truck, consented to search the phone. Antonelli searched the phone, got the phone number off of it. It was after that, my reading of the record, that they went through the inventory and said what here is yours. So if the agent couldn't have been relying, if my reading is correct, couldn't have been relying on some statement like that to justify the search. I guess the second search he was relying on the statement from the Border Patrol agent who said he gave us consent. So he didn't hear it directly from your client, but he heard it from another agent who said he gave us consent. Based upon that, he then looked in the phone. Is that a good faith exception situation where he was relying on the fact that it had been represented to him that your client had given consent? I don't believe so because at least on the scene, the agent had said, may I see your phone, may I look through your phone. Mr. Escamilla handed him the phone. The agent looked through it and handed it back. And it's not clear from the record how Agent Antonelli came to possess the phone. Was it when he was looking through the truck? And did he find the phone while he was looking through the truck? If so. But he didn't look through it until he was told by the other agent that your client had given consent. He said, I didn't believe I needed one because I thought he had consented. But it seems like under the circumstances, it was clear that it was a roadside consent. Oh, you know, look at it. He looked at it and gave it back. I don't believe for good faith. I think the knowledge of all the agents would be attributed to each one. Did the government argue good faith below? I mean, the court didn't. I don't believe they did. That was raised on appeal, I believe. On the harmlessness question, on the harmlessness, how do you deal with your client's inculpatory statements to his girlfriend that were recorded and presented at trial? That was other than the cell phone stuff. That probably. Those are the big two. Those are the two most powerful. Yeah. But that defense counsel probably could have tried to explain that away in closing. How? I think if my memory of it is correct, it seemed like it was a little bit equivocal on what the meaning of it was. But I focused on the actual records. So I'm not. It's not that detailed. I agree on that. I think it was something kind of in passing. I mean, yeah, it was not a good piece of evidence, but it probably could have been at least explained and addressed. But the cell phone records, you can't attack that. I mean, he does say, I'll fess up to the marijuana, but I'm not taking the heroin. I mean, it could maybe just be ready. You know, sometimes defendants just are willing to plead to get cases dismissed. But he does go further and talk about the phone and why he'd leave the chip in the phone. Probably the district court wouldn't have thought through the difficult good faith question because the district court seems to have been under the absolute misapprehension that the phone was never returned. Isn't that right? The district court's order says possession constant. And we know that's clear error, right? Right. So good faith wouldn't have come up, at least in the district court's mind. It's an interesting issue. Am I right on thinking that? Well, the district judge did say that I think her order says it appears that the phone was never returned to Mr. Escamilla. But the agent who initially searched it on the side of the road stated several times, searched it, handed it back to him. And there was no contrary evidence to that. Great. Okay. Thank you very much. You have some time remaining for rebuttal. Ms. Kalluri. Ms. Kalluri. May it please the Court, Anna Kalluri on behalf of the United States. I can start with reasonable suspicion or just jump straight to the phone, which seems to be of interest to this Court. Maybe jump right to if this district court made such an obvious and clear error, wouldn't that have sort of infected the whole analysis of the Fourth Amendment? The district court just stops at he gave consent, they never gave it back, continuous consent, no awareness of the Lefebvre II search issue, no awareness of good faith. And the question I have for you is, does the government agree that fact-finding was clearly erroneous? I agree that the fact that she, I believe, the line is that it appears that Agent Garcia kept defendant's phone after defendant handed it to him. Right. I believe, yes, that is incorrect based on the testimony. So we're just, so everything we're doing now is trying to assess Fourth Amendment theories that the district court would never have reached, really, because the district court thinks it starts and stops with what looks like fairly straightforward consent at the road. Well, yes and no. I think it's important to go through the facts of what happened. So according to the testimony, the phone was handed over to Agent Garcia. He looked through it. He found the contacts. He's looked for any recent calls. He handed it back to — But no fact-finding that he saw the defendant's own number. I mean, it's an old flip phone. No. Okay. So we don't get that. No. There's no information that he, at that point — and that wasn't his concern. Right. Okay. So we move to the next search. He was looking for communication between the two phones. So he handed it back. Mr. Escamilla had it in his possession. He didn't use it. There's no use of the phone. He has it in his possession until he's taken eventually later, after the reasonable suspicion and the apprehension of the F-250. He's taken to a station. And when he's at the station, they, again, they take all of his possessions as they would as they are processing any person who's coming in. And with that, they take the change. They take the necklaces, his ID, and the phone. Those are all part of inventory. And they take that from him then. It rightfully ends up into the possession of Agent Antonelli. When he arrives at the station, the DE agents hand these items over to him. They speak. He gets the report. They also tell him that Mr. Escamilla consented to the search of the phone. That's when the second search happens there. So — But no abandonment yet. No abandonment yet. And he does get the phone number at that point. No abandonment yet. No revocation of the consent to search the phone. There's been nothing that has happened to the phone between — But it had been given back to him. Isn't the factual mistake the district court made critical on the analysis of the Antonelli search? Because you cite the White case, for example, the van search case, I think from 1980. There, a guy consents to searching his van. And they do it a couple days later. They said the consent was still good. But that was the one search happened. Here, it's back in the defendant's possession. The consent on the roadside is complete. And that consent was just handing the phone. It wasn't a signed statement. It wasn't some general grand scope of consent. What's the basis to say that when it's been returned to him that there is a consent for a second search? Going back to the initial consent, there's nothing that requires it to be in writing and detailed. No, assume the first perfect consent. But you still have to look at exactly the interaction. But assume the first one's valid. Correct. Why does handing over the phone on a roadside stop, but then getting it back, why does that handing it over an hour before the second search, or I don't know the exact timeline, but why would that support then taking the phone again and searching it? Well, I think his reliance on the initial consent was proper for a few reasons. One, the consent initially was general and unrevoked. They asked if they could look through the phone. He handed it over. They looked through it. The second search occurred only four hours later. It was in the scope of the same investigation. Granted, it was by a different agent, but it was still in the scope of the investigation. Why would you revoke, though, if you get the phone back? I guess that's where it seems different to me than these cases talking about. I understand if the police still have it, the obligation might be on the individual to say, oh, you know, I want that back. Give it back to me. But he had it back. What did he need to revoke? He did have it back. But then it was taken for the processing part of it. And I think the important fact here to note, too, is it comes out in trial, and I think the record is 1113, that Mr. Escamillo was in the presence of the agents as they were going through both phones. So before he abandoned it, during the second search, he was there. He didn't revoke. He didn't say anything. But they lawfully took it as inventory when they're booking him. So it's really a big onus on him to realize, well, okay, they can take it from an inventory standpoint, but when they actually look inside the phone, I mean, these are, you know, questions the Supreme Court's had to grapple with recently that I still then could have said, even though you can inventory the phone and keep it, I should tell you, but don't look inside it. But that's your argument. He shouldn't. It is my argument. It's his burden to revoke the consent that he gave lawfully four hours before. This is a continuum. This is still the same investigation. Make that argument. It would help me if you could give me a case for either of these two propositions. One, a case that stands against the treatise language I'm sure you've read from Lefebvre, that a second search needs second consent. So if you have a case that says continuous consent even when given back with agents saying I'm done, if you have a case on that, and if you don't, then I'd love you to tell us if you have a case on good faith and whether the government preserved that argument below. Is there a case that says if second agent says, hey, did you get consent, and they say yes, that his search would then be permissible under Leon? Do you have a case for either of those propositions? So I don't have a case for the first proposition, but I believe if you go back to the brief we do a good job at distinguishing the rest of Lefebvre and going through and using Lefebvre's own words and factual scenarios. That was a good argument. I'm just no case. Do you have a good faith Leon case for this situation? No, because it wasn't argued to the district court below. The last question I have for Case Laudan is do you have a case on, well, could you discuss Finley? If we then move to the third search and say, well, is that one an abandonment, which then led to them finding it harmless error? So I'm going back to the good faith for just a moment, Your Honor. Realizing this court can affirm on any basis, so I believe that we raised it in our brief, and that is still here, and that's something that this court can affirm. Did you raise it below, though? I didn't see anything below in the briefing that raised it, and it's an issue on which the government bears the burden, so I would think the government has to tell the district court alternatively rely on good faith. No, because, quite frankly, I believe we have many other alternative arguments going through, even if the second search was improper. Do you have to raise good faith in the district court to have us rule on it? I don't know definitively the answer to that question. My inclination is no, but I do agree that it was not raised, no, because we, quite frankly, didn't need to get that far in the district court. I apologize, Your Honor. Who was the third? It was really where I was pressing, opposing. Oh, Finley. Did this gentleman disclaim it, abandon it, so much so that the government inevitably got the relevant data, his phone number, and then the second phone's search got you all the records to make it alternate? Absolutely. One point about Finley, I don't believe that's in the briefs. I've looked, and I don't recall it, and I just looked through the table of contents. He said it was. It could be, and I can follow up with the court on there. I just apologize. I looked through briefly, and I didn't see it, and I'm not recollecting it. I can certainly follow up on that if it's very important. But I would go back to Powell, which is a 2013 case out of this court, and two people are stopped, the defendant is the passenger, and the officer who's standing next to the vehicle hears the phone ringing, and the driver says it's not his, it's between the car door and his seat, and the passenger says it's his, completely denying ownership, interest, anything like that. And the court felt that the passenger had voluntarily abandoned the phone by disclaiming ownership of it, and that she lacked standing to challenge anything. And I think that's very similar to what we have here. He, when asked to claim his belongings, he did not claim it. He claimed three of the four things that were in front of it. Not only did he not claim it, he said, that isn't mine. Did you argue standing below as to this phone? Yes, we did. You challenged his standing to it? Correct. Okay. Correct. We argued that he didn't have standing, and then we argued even if he did, he abandoned it at this point. The district court went off on the second, assuming standing, consent, continuous, never gave back, wrong fact. That's sort of how the district court went. The district court said he abandoned it at that point, assuming he had standing before that. When he said, this isn't mine, he claimed three items, the change, the ID, the necklaces. He did not claim. That's not really inevitable discovery. That's he's disclaimed it. True. Two different arguments. There's one, there's abandonment. But I think there's also inevitable discovery here. The agent testified that had he claimed it, he would have gotten a search warrant for it. He didn't get a search warrant in the beginning because he was told that Mr. Escamilla had given consent for the search, so he searched it. Had at any point Mr. Escamilla claimed it at that point, he would have gotten a search warrant to get the same data off of it that came from this Elbright examination later. So we have a couple different options here. Essentially, inevitable discovery because we would have sought and obtained a What's your best case for inevitable discovery? I think Ochoa from 2012. There, an officer was driving a vehicle to a station. It was the defendant's, and he heard a phone ringing in there. At one point, he found the phone. He opened it up. He looked forward. Court found that there was inevitable discovery later because everything would have been inventoried, and they would have found it there, and ultimately would have been able to obtain the records from it. Isn't it a cleaner argument just to say if the phone was abandoned, which you're arguing it was, that the third search with this Elbright that got all the information out of the phone, that that was an independent source or just on its own enough versus all this hypothetical inevitable discovery steps? Yes. Yes, it is a cleaner argument, but I think the point is that you can get to the ultimate destination if we would have obtained this information through a variety of ways. Let me ask you about the harmlessness. This was very powerful evidence. It was well over 100 calls, I believe, in a short time frame. The government emphasizes it in closing argument. It was also important enough evidence the prosecutors decided to use it at trial, knowing there was this big suppression issue. I mean, I think we've got four or five Fourth Amendment issues in this appeal. It seems like it's otherwise a clean case. There's no other allegations of trial error. But the prosecutor at trial thought it was important enough to push these Fourth Amendment issues. Doesn't that make it tough for you to show meets your burden on harmlessness? I don't think so, Your Honor, and I think that we used it at trial because we believe that everything that happened was proper. And you used it because it was very powerful evidence. And we used it because it was powerful evidence. Even though it was, though, there was plenty of other evidence connecting Mr. Escamilla to the Ford F-250. And so I don't believe that the phone calls ended up themselves. One, they weren't the only connection between the two. But also, in view of everything else that we showed at trial, it is harmless. And you have his recorded statement to his girlfriend. What else would you point us to? What's the other best evidence? Okay, so we have Garcia recounting all of the details of the stop, what they saw, including the fact that Escamilla and the F-250 were driving in tandem. We have Jennings testifying about how he chased the F-250, which contained the marijuana and heroin. Antonelli testified that both the F-150 and the F-250 contained many identical items, including the flip phones, which were identical, the safety vest, work gloves, shirts, the air fresheners. We have Benny Ramirez testifying that he had previously transported illegal drugs with both Escamilla and Mr. Gomez using the F-250 truck in Laredo through the ranch roads to circumvent the checkpoints. Mr. Ramirez also testified that after Escamilla's arrest, he admitted that he had been caught helping transport the marijuana and heroin, in part because the agents found his glove in the load vehicle. The car dealer who sold the F-150 testified that Gomez had test-driven the F-150 just before it was purchased by Cantu. The F-150 that Mr. Escamilla was driving was registered to Cantu. And then we have the recorded phone call between Mr. Escamilla and his girlfriend. So there was a number of things that were linking them. Yes, the phone records were part of that, but they weren't the only thing, and they weren't dominant enough that this is not harmless error. The recorded phone call wasn't from this phone? You didn't have the number? No. Unless there are any further questions, I'll rest on my brief. First off. The Court was asking about the Finley case. I didn't — it's cited in the brief. I didn't go through a lot of analysis of it. I relied on a case from the Ninth Circuit that was more analogous to the facts we have here that — Is it in your table of authorities? I think I left Finley out of the table of authorities. I was looking at that this morning. But the Ninth Circuit case, it does cite, and in the brief I'm citing too, Finley. But the Ninth Circuit case is actually much more on point, but it relies on Finley's reasoning to say that just because someone says, that's not my phone, if they have a — if they've used it, then they have a privacy — continuing privacy interest in the phone. And Finley is very similar, except that the defendant in that case didn't say, that's not my phone. He just said, well, it's — I used the phone. The government's point was that he didn't have privacy interest in it because it was provided by his employer. So he didn't disclaim it in Finley? No. You're saying in the Ninth Circuit case he was claiming, but the Ninth Circuit's still sufficient? Right. Right. And cited Finley. What's the Ninth Circuit case? It is United States v. Lopez Cruz at 730 F. 3rd, 803. And that's a 2013 case. And it cites the Finley case, which was 2007. Finley was overruled on other grounds based on a search incident to arrest issue that was raised later in the Supreme Court, not on Finley itself, but otherwise the reasoning of Finley and the privacy interest. I thought in your brief you were making an argument that the search of this phone tainted the search of the phone that was found associated with the other pickup truck. I didn't make that. Okay. No? No. Something about how because the SIM card, no, that wasn't? No. Because basically once they — my client didn't have a privacy interest in the other phone. And the other phone allowed them to get the list of all the calls. Right. So it really is just the identity, the phone number of this phone that is? Right. And the thing is that even with a search of the other phone that showed all the phone numbers that it called, that wouldn't have connected Mr. Escamilla to the conspiracy because they wouldn't have known the phone number connected with the phone that they found on Mr. Escamilla. Yes. So they just would have had a list of phone numbers. Do you notice flip phones, when you flip them open, the number's not right there? You know, like on Apple phones now, you hit contacts, there's your number? I really don't know. Okay. That's fine. It is like a Fourth Amendment law school exam, so thank you. Okay. Thank you. Thank you. Thank you both. Mr. Frizzell, thank you. You're court-appointed. The court appreciates your service to the court.